NOT DESIGNATED FOR PUBLICATION

No. 128,724

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

DANIEL C. SHRUBSHALL,
*Appellant*.


MEMORANDUM OPINION

Appeal from Sedgwick District Court; TYLER ROUSH, judge. Submitted without oral argument. Opinion filed August 7, 2026. Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Lance J. Gillett*, assistant district attorney, *Marc Bennett*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before ARNOLD-BURGER, P.J., MALONE and PICKERING, JJ.


PER CURIAM: Following a sprawling incident of domestic violence against his girlfriend and disregard of no-contact orders, a jury found Daniel C. Shrubshall guilty of aggravated kidnapping, rape, aggravated battery, two counts of aggravated domestic battery, and four counts of violation of a protective order. The district court imposed a controlling sentence of 840 months' imprisonment. Shrubshall claims: (1) The district court erred by failing to provide lesser included offense instructions for aggravated kidnapping; (2) the district court erred when it failed to give a unanimity instruction for the multiple acts that could have constituted confinement for aggravated kidnapping; (3)

1

there was insufficient evidence to support the consent element for the rape conviction; (4) the State committed prosecutorial error during closing argument; (5) his rape conviction violates due process because it is a strict liability offense; and (6) the rape statute is unconstitutionally vague because it requires no mens rea. After thoroughly reviewing the record, we find no reversible error and affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

On September 30, 2022, Shrubshall and his girlfriend—who will be referred to by the pseudonym, Susan—took a ride with one of Shrubshall's friends to cash a check in Wichita. While they were waiting in line at Ace Check Cashing, Shrubshall grew angry and threatened Susan, telling her he would cut her tongue out. He went outside to wait in the car. When Susan returned to the car with the money, they went to her aunt's house to obtain some methamphetamine. Susan went in the house on her own, but a few minutes later Shrubshall followed her because he thought she was taking too long. Shrubshall's friend drove them back to Shrubshall's house and left.

As they walked toward the house, Shrubshall suddenly began attacking Susan, grabbing her by her throat and slamming her down on to the ground. Susan could not breathe as Shrubshall held her on the ground, hand clasped around her throat. While she was being choked, Susan went in and out of consciousness and urinated on herself. When Shrubshall let go and Susan managed to get up, she noticed that her nose was broken and bleeding. The couple struggled and screamed at each other for a few minutes but eventually went inside Shrubshall's house.

When they got inside, Shrubshall again attacked Susan, knocking her onto the couch and choking her. Once again, Susan was not able to breathe, lost consciousness, and urinated. She thought she was going to die, but suddenly, the attack stopped. They argued about the money from the check. Shrubshall told Susan, "to take the money" and

2

"get out of [his] life." Susan picked up the cash from the floor and ran out of the house across the street to a neighbor's house, with Shrubshall chasing behind her.

As Susan got across the street, additional neighbors came to intervene because they had heard the struggle and screaming. One of the neighbors heard Susan say, "either she had been raped or she was being raped." The neighbors asked if Susan was okay and questioned whether they needed to call the police. When Shrubshall suddenly appeared and began yelling and threatening the neighbors too, Susan told them to call 911. Shrubshall screamed that he would shoot and kill them all. The neighbors told Susan to come with them, but she refused. Susan recalled that although she was afraid, she followed Shrubshall back to his house because she loved him. As Susan and Shrubshall left, a neighbor called 911. One of the neighbors heard a loud slap followed by a scream as Shrubshall and Susan walked out of sight. Another neighbor heard Susan screaming, "[Y]ou hit me hard. You hit me really hard."

Shrubshall and Susan continued yelling at each other in the yard and eventually went back inside the house. Shrubshall told her to get into his bathroom and clean the blood off her face. Shrubshall followed her into the bathroom with a huge knife and sat down on the toilet as Susan used a towel to clean her face. He began twirling the knife in his hand and again threatened to cut her tongue out. Susan felt trapped and did not think Shrubshall would let her leave. Susan began to hear police radios outside the house. She crawled from the bathroom into the bedroom, with Shrubshall following behind her. Susan started to take off her bloody shorts and her underwear when Shrubshall began having vaginal intercourse with her on the floor. Susan let Shrubshall have sex with her "[o]ut of fear," explaining that she "just wanted to make it out alive." The police kicked in the door to the house and Shrubshall commanded Susan to get in the closet. Susan did so, because she felt that she had no other choice. Once they were inside the house, the officers quickly arrested Shrubshall and found Susan hiding in the closet under a blanket.

3

The officers told Susan to get out of the closet and to put her clothes on. When they asked her what had happened, Susan did not respond but repeatedly pointed at her neck and looked nervously toward the living room. After the officers assured Susan that Shrubshall had been taken into custody, she briefly spoke to them as they led her to the paramedics. While they treated her injuries to her face, head, and neck, Susan told the paramedics that "her boyfriend had been holding her hostage and physically, verbally, sexually assaulting her." On the way to the hospital, Susan also described losing consciousness and urinating while she was being choked.

At the hospital, Susan refused to undergo a sexual assault (SANE/SART) examination. But she reported to the doctors that she had been sexually assaulted and choked, and she was diagnosed with a choking-type injury by manual strangulation based on the bruising around her neck. A CT scan of her face indicated that Susan suffered a bilateral nasal bone fracture, swelling over her nasal bones, and an irregular thyroid, likely caused by choking or trauma. While at the hospital, Susan spoke with a detective, who took pictures of her injuries. She described to the detective that Shrubshall had hit her in the face and choked her several times.

Later that evening, other law enforcement officers spoke with Susan about the incident. She told one officer that the intercourse she had with Shrubshall was not consensual—she claimed that she never told him "no" but only had sex "because she thought the best thing for her to do at this point was to go along with him and to make him happy." She also told a detective that she and Shrubshall had a turbulent relationship and often argued about money and that Shrubshall suffered from paranoia. She explained that this tension had boiled over when they went to cash the check and likely caused Shrubshall to threaten to cut her tongue out. She recalled that when they got home with the cash, Shrubshall had attacked and choked her in the driveway and resumed his attack once they went inside the house, where Shrubshall choked her again until she went unconscious. Susan then recounted leaving the house and then returning, when

4

Shrubshall attacked her again. She told the detective about Shrubshall threatening her with a knife in the bathroom and ordering her to crawl to the bedroom when police first arrived. She explained that she did not feel like she could have left and that she feared Shrubshall would kill her if she tried. She recounted that Shrubshall had yanked her shorts and panties off in the bedroom and had sex with her.

Detectives interviewed Shrubshall early the following morning. He told them about his fight with Susan, explaining that any injuries she had suffered were from Susan engaging in self-harm. He denied their sexual encounter was nonconsensual and was confident that Susan would corroborate his version of events. He also claimed that Susan used sex as a mechanism to calm him down when they fought and argued. Later that day, while he was in the Sedgwick County jail and before any charges were filed, Shrubshall placed several calls to Susan, which were monitored by the detectives.

*Charges and proceedings in district court*

On October 4, 2022, the State charged Shrubshall with aggravated kidnapping, rape, two counts of criminal threat (one for the check store incident and one for the bathroom incident) and several battery-related offenses. At his first appearance that day, the district court imposed a no-contact order with Susan. Despite the no-contact order, Shrubshall called Susan four more times the next day. During these calls, which were monitored by law enforcement, Susan and Shrubshall discussed how she could help get him out of trouble. She agreed to do so because she "loved him and . . . wanted him to come home" but also "out of fear." Shrubshall threatened to hurt her and her children if she did not help him. The following week, the State added four counts of misdemeanor violation of a protective order based on these calls.

On October 24, 2022, Susan wrote a letter to the detective on the case, in which she claimed that the statements she had made to the police had been fabricated:

5

"I hate to even admitt that I lied and made false accusations Stating [Shrubshall] did some very harmful horrible Things to me and That is not true at all not even close to the truth about what really happened that (day/night) . . . Shrubshall never touched me in Any kind of harmful way He never put his hands on me in any kind of harmful way or Did any of the Things I accused him of or Stated He did He is completely innocent All He did was try and take care of me because I was hurt and He wasn't going to contribute to me going out and running Streets so I could go get high on meth."

In short, Susan asserted that she had made up the accusations against Shrubshall because her mother had recently passed, she had been drinking and using methamphetamine, and she was suicidal. All told, Susan wrote three letters to the detectives in the case, attempting to recant all of her statements about the incident.

At the preliminary hearing, Susan again waffled about her recollection of the events. She acknowledged that she and Shrubshall had argued about money and that Shrubshall had choked and slapped her, but she claimed that she did not remember anything that went on inside the house, nor did she remember telling officers about any sexual encounter. She explained that she was not "in a good state of mind" at the time of the incident because she had just lost her mother and she had tried to hang herself and cut herself. And she added that she did not want to testify against Shrubshall. Based on the other evidence presented by the State, including Susan's statements to law enforcement after the incident, Shrubshall was bound over for trial on all the charges.

When Susan failed to appear to testify at a later hearing, the district court issued a material witness warrant and Susan was taken into custody pending Shrubshall's trial. After being taken into custody, Susan wrote additional letters to the prosecutor, in which she stated that if the State retracted the warrant she would "come to court [and] testify and tell the court[] exactly what happened just as I told the detectives." But the State declined to release her from the material witness warrant until after she testified at trial.

6

At trial, the State presented the testimony of Susan, Shrubshall's neighbors, various police officers who investigated the incident, and the paramedics and doctors who treated Susan. The State also presented videos of Susan's conversations with law enforcement and the various jail calls between Shrubshall and Susan. Susan described the incident in detail, from her and Shrubshall's tensions about money to the physical altercation itself. She explained how Shrubshall started attacking her when they returned to his house, repeatedly choked her to the point of unconsciousness, threatened her with a knife, and ordered her to comply with his demands. During her testimony, Susan indicated that she had wanted to have sex with Shrubshall, though she acknowledged that she told the responding police officers that she did not. She explained, "I did tell them that. But I can't—I can't honestly sit here and say that I didn't want it to happen or that I didn't enjoy it at that point in time." These statements were contrasted with the recorded interview she had with law enforcement at the hospital, which was played for the jury.

Shrubshall did not testify at trial and called no witnesses. As part of his defense, he introduced the letters Susan had written to law enforcement recanting her story and then offering to testify if the material witness warrant was lifted. In closing argument, Shrubshall generally denied the charges, attacked Susan's credibility and pointed to her inconsistent statements, and focused on her testimony that she consented to the sex. After hearing the evidence, the jury acquitted Shrubshall of the criminal threat counts but found him guilty of aggravated kidnapping, rape, aggravated battery, two counts of aggravated domestic battery, and four counts of violating a protective order.

On January 3, 2025, the district court imposed a controlling sentence of 840 months' imprisonment. Shrubshall timely appealed the district court's judgment.

*The district court did not commit clear error by failing to instruct the jury on lesser included offenses of aggravated kidnapping.*

Shrubshall first claims the district court erred by failing to provide unrequested lesser included offense instructions for aggravated kidnapping. He claims the district court should have instructed the jury on the offenses of kidnapping and criminal restraint. The State concedes that a lesser included offense instruction for kidnapping may have been appropriate but asserts that an instruction on criminal restraint would not have been factually appropriate. Moreover, the State asserts the district court's failure to give either of the unrequested jury instructions was not clear error.

In reviewing claims of instructional error, an appellate court first considers whether there is appellate jurisdiction and if the issue was preserved for review. Next, this court reviews whether the requested instruction was legally and factually appropriate. Finally, if there was an error, this court will determine whether it requires reversal of the conviction. *State v. Ervin*, 320 Kan. 287, 293-94, 566 P.3d 481 (2025).

When, as here, a party raises a jury instruction issue for the first time on appeal, this court must determine whether the failure to give the instruction was clearly erroneous. K.S.A. 22-3414(3); *State v. Turner*, 318 Kan. 162, 166-67, 542 P.3d 304 (2024). To be clearly erroneous, the instruction must have been legally and factually appropriate and this court must be firmly convinced the jury would have reached a different verdict had the instruction been given. Shrubshall has the burden to show both error and prejudice. See *State v. Mendez*, 319 Kan. 718, 727-28, 559 P.3d 792 (2024).

"Aggravated kidnapping is kidnapping . . . when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-5408(b). Kidnapping, as Shrubshall was charged with committing, is "the taking or confining of any person, accomplished by force, threat or deception, with the intent to hold such person . . . to inflict bodily injury or to terrorize

8

the victim or another." K.S.A. 21-5408(a)(3). "Criminal restraint is knowingly and without legal authority restraining another person so as to interfere substantially with such person's liberty." K.S.A. 21-5411(a).

An instruction on a lesser included offense of the charged crime is a legally appropriate instruction. *State v. Plummer*, 295 Kan. 156, 161, 283 P.3d 202 (2012). Kidnapping and criminal restraint are lesser included offenses of aggravated kidnapping. K.S.A. 21-5109(b)(1); K.S.A. 21-5408; K.S.A. 21-5411; *State v. Simmons*, 282 Kan. 728, 742, 148 P.3d 525 (2006). The State does not dispute that instructions on kidnapping and criminal restraint would have been legally appropriate.

A jury instruction is factually appropriate if, viewing the evidence in a light most favorable to the defendant, there was sufficient evidence that would have supported the instruction. This is not an onerous standard; the "court must consider whether there is some evidence, viewed in a light most favorable to the defendant, emanating from whatever source and proffered by whichever party, that would reasonably justify the defendant's conviction for that lesser included crime." *State v. Lowe*, 317 Kan. 713, Syl. ¶ 1, 538 P.3d 1094 (2023). In doing so, this court does not reweigh the evidence or reassess witness credibility. *State v. Gomez*, 320 Kan. 3, 11, 561 P.3d 908 (2025).

The State concedes there was evidence to support a lesser included offense instruction on kidnapping. The distinguishing element between the two offenses is the infliction of bodily harm. Viewing the evidence in a light most favorable to Shrubshall, the jury presumably could have found the injuries Susan sustained occurred at a different time than the taking or confinement.

The State maintains a lesser included instruction for criminal restraint was not factually appropriate because the evidence showed that Shrubshall confined Susan by force or threat, not that he merely interfered with her liberty. An instruction on criminal

9

restraint is factually appropriate so long as there is some evidence that would support the offense. See K.S.A. 22-3414(3). While Shrubshall's actions appear to be more severe than merely a substantial interference with Susan's liberty, the nature and extent of Susan's confinement was a fact question for the jury to decide. And "[a] district court has a duty to instruct the jury on any lesser included offense established by the evidence, even if that evidence is weak or inconclusive." *State v. Nelson*, 291 Kan. 475, Syl. ¶ 1, 243 P.3d 343 (2010). Thus, an instruction on criminal restraint would have been factually appropriate.

Because Shrubshall did not request lesser included instructions for kidnapping or criminal restraint, this court must determine whether the district court's failure to give the instructions was clearly erroneous. And the burden is on him to firmly convince this court that the jury would have reached a different verdict had the instructions been given. *Mendez*, 319 Kan. at 727-28. As noted above, the difference between aggravated kidnapping and kidnapping is the infliction of bodily injury. And the difference between aggravated kidnapping and criminal restraint is whether Shrubshall actually confined Susan by force or threat as opposed to substantially interfering with her liberty.

The State presented overwhelming evidence that Shrubshall confined Susan by force or threat and that Susan was injured during the ordeal. Shrubshall presented a general denial defense. The weight of the evidence presented at trial leaves us with little doubt that the jury would have convicted Shrubshall of aggravated kidnapping even if instructions on kidnapping and criminal restraint had been given. The burden is on Shrubshall to show clear error. *Mendez*, 319 Kan. at 727-28. Shrubshall fails to firmly convince us the jury would have reached a different verdict had the other instructions been given. Thus, we conclude the district court did not commit clear error by failing to instruct the jury on the lesser included offenses of aggravated kidnapping.

10

*The district court did not commit clear error by failing to give a unanimity instruction on aggravated kidnapping.*

Shrubshall next claims the district court erred by failing to give a unanimity instruction for the multiple acts that could have constituted confinement for aggravated kidnapping. The State responds that a unanimity instruction was not factually appropriate and, even if it was appropriate, the failure to give it was not clearly erroneous.

When a case involves multiple acts, the jury must unanimously agree on which specific act constitutes the crime. K.S.A. 22-3421; *State v. King*, 297 Kan. 955, 977, 305 P.3d 641 (2013). To ensure a unanimous verdict in such cases, the district court must give the jury a unanimity instruction or the State must elect the act it relies on for the conviction. 297 Kan. at 978. As explained above, an appellate court generally reviews jury instruction errors by asking whether the party preserved the issue, whether the jury instruction is legally and factually appropriate, and whether any error requires reversal. See *Ervin*, 320 Kan. at 294. But this court uses "a more particularized test when, as here, a defendant challenges a district court's failure to give a unanimity instruction in a case potentially involving multiple acts." *State v. Garcia-Martinez*, 318 Kan. 681, 693-94, 546 P.3d 750 (2024). First, this court will determine whether the case involves multiple acts. If it does, this court must next consider whether an error occurred because the district court failed to give a unanimity instruction and the State failed to elect which act it was relying on. Third, if there was an error, it must be determined whether it requires reversal. *State v. Harris*, 310 Kan. 1026, 1039, 453 P.3d 1172 (2019).

Under the first step, we must decide "'whether the defendant's actions could have given rise to multiple counts of the charged crime or whether the alleged conduct was unitary.'" 310 Kan. at 1039. Our Supreme Court has explained that "'acts are multiple acts if they are factually separate and distinct.'" *State v. Moyer*, 306 Kan. 342, 360, 410 P.3d 71 (2017). We look to several factors to determine whether conduct was unitary: whether

11

the acts occurred at or near the same time; whether they occurred at the same location; whether an intervening event occurred between the acts; and whether a fresh impulse motivated any portion of the acts. *Harris*, 310 Kan. at 1039. If upon review of these factors it is determined that the alleged conduct is unitary, no unanimity instruction is necessary and the analysis ends. *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007).

Shrubshall contends the State presented a multiple acts case because "[t]here were at least five possible times when the jury could have found taking or confinement as described at various points in [Susan's] changing testimony." These five instances include: (1) when he confined Susan on the couch; (2) when he forced her back inside the house; (3) when he confined her in the bathroom; (4) when he confined her in the bedroom; and (5) when he confined her in the closet. The State alleges that these incidents are not multiple acts but a "series of acts in the course of unitary conduct establishing a continuous incident" wherein Susan was confined from the time she reentered the house with Shrubshall until the police discovered her in the closet.

Applying the four-factor multiple acts test suggests that Shrubshall's conduct was unitary and cannot be factually separated. Each of the instances of confinement that Shrubshall identifies following when Susan reentered the house after going to the neighbors was part of one unitary conduct. Shrubshall confined Susan on the couch while he was choking her, then ordered her into the bathroom where he menacingly wielded a large knife, then commanded her to the bedroom and then the closet. The evidence shows that all of the acts Shrubshall has identified that could form the basis of the aggravated kidnapping charge occurred around the same time. All of the acts of confinement occurred in his home, and they were not interrupted by an intervening event or spurred on by any fresh impulses. Shrubshall's actions which formed the basis for the aggravated kidnapping charge involved a single course of conduct, not separated by distinct time periods, locations, or causal relationships. In other words, this is not a multiple acts case. Thus, a unanimity instruction would not have been factually appropriate.

12

Even if we found that Shrubshall's conduct constituted multiple acts and the district court erred in failing to give a unanimity instruction, Shrubshall cannot meet the high threshold to show clear error. This is especially the case given the nature of Shrubshall's defense, which was to challenge the reliability of Susan's testimony and generally deny that he committed any of the crimes. Our Supreme Court has expressed that it is "less inclined to reverse a multiple acts error where the defendant presented a unified defense, *e.g.*, a general denial." *Moyer*, 306 Kan. at 362-63. As explained above, Shrubshall presented a general denial defense to the State's charges—he insisted that he did not commit any of the alleged crimes and argued that Susan's testimony was inconsistent. He did not present a separate defense to any of the alleged acts. Shrubshall fails to firmly convince us the jury would have reached a different verdict had a unanimity instruction been given. Thus, we conclude the district court did not commit clear error by failing to give a unanimity instruction on aggravated kidnapping.

*There was sufficient evidence to support Shrubshall's rape conviction.*

Shrubshall next claims the State failed to present sufficient evidence to support his rape conviction because it failed to produce evidence that Susan did not consent to sexual intercourse. The State maintains there was sufficient evidence for a reasonable juror to find Shrubshall guilty of rape beyond a reasonable doubt.

An appellate court reviewing whether the State presented sufficient evidence to sustain a conviction looks at all the evidence in a light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. In doing so, this court will not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. See, e.g., *Harris*, 310 Kan. at 1030.

To sustain a conviction for rape as charged, the State was required to prove that Shrubshall knowingly engaged in sexual intercourse with Susan without her consent and

13

while she was overcome by force or fear. See K.S.A. 21-5503(a)(1)(A). Shrubshall challenges only the element of lack of consent. He focuses on Susan's testimony that she actually *did* consent to sexual intercourse. But Susan's testimony was not the only evidence to support her lack of consent.

Susan's trial testimony, which indicated that she had consented to the sexual encounter, was contrasted with her recorded interview at the hospital. Susan described that Shrubshall "jerked [her] pants off of [her] and he just started having sex with [her]." She nodded her head in agreement when the officer asked her if she was afraid to tell Shrubshall to stop. And when asked if the sexual encounter was consensual, Susan said, "Well, no I didn't tell him it was okay, but I didn't tell him to stop either. . . . I just went along with it cause I thought it was the safest thing for me to do." The evidence of Susan's recorded interview suggested she did not consent to having sex and merely did so because she thought she needed to go along with Shrubshall to protect herself.

It was the jury's responsibility to weigh the differing accounts Susan provided. As our Supreme Court has explained, "[I]nconsistencies between a witness' statements to law enforcement interviewers and his or her trial testimony" presents an issue of witness credibility, which is best tested via cross-examination. *State v. Lopez*, 299 Kan. 324, 330, 323 P.3d 1260 (2014). After a witness' inconsistent statements are highlighted by cross-examination, "it [is] up to the jury to assess [the witness'] credibility and to assign the weight to be given to [their] trial testimony." 299 Kan. at 330. In other words, when a jury is presented with conflicting accounts from the same witness, such as with Susan's statements about her consent, it must weigh the evidence and decide what to credit. Here, the jury appears to have given greater weight to Susan's statement to law enforcement directly after the incident, rather than her later testimony at trial.

While Susan's testimony was inconsistent, the jury was tasked with weighing the evidence and determining whether it believed Susan's trial testimony or recorded

14

statements to be the more accurate summation of the events. It is not this court's role to second guess that assessment, reweigh the evidence, or reassess Susan's credibility. *Harris*, 310 Kan. at 1030. Viewed in a light most favorable to the State, there was sufficient evidence for a reasonable juror to find that Susan did not consent to having sexual intercourse with Shrubshall but was overcome by force or fear. Thus, we conclude there was sufficient evidence to support Shrubshall's rape conviction.

*The State did not commit prosecutorial error during closing argument.*

Shrubshall next claims that the prosecutor misstated the law and mischaracterized the facts during closing argument and that those errors affected the outcome of his trial. The State maintains that the prosecutor did not misstate the law or the facts and, even if the prosecutor did err, Shrubshall is not entitled to relief.

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial. In evaluating prejudice, we simply adopt the traditional constitutional harmlessness inquiry demanded by *Chapman* [*v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)]. In other words, prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.' [Citation omitted.]" *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

Shrubshall argues that the State committed two different prosecutorial errors during its closing argument. First, he contends the prosecutor misstated the law and conflated two elements of the crime of rape by telling the jury that as to a victim's lack of consent:  "Just going along with it out of fear is not consent." Shrubshall asserts the

15

prosecutor conflated the "overcome by force or fear" element of rape with the "lack of consent" element of the crime. Second, he asserts the prosecutor misstated the facts by emphasizing that Susan told a police officer the sexual encounter was not consensual.

As for Shrubshall's first argument, he contends the prosecutor basically told the jury that two elements of the rape offense were effectively the same thing, rendering the lack of consent element "meaningless surplusage." But what the prosecutor said was more nuanced. He began his closing argument by stating:

"'I just went along with it, you know. I thought it was the safest thing for me to do.' Those are the words [Susan] used at a hospital talking to Officer Kanhasee, explaining why she went along with Daniel Shrubshall putting his penis in her vagina even though, as she told Officer Kanhasee, she did not consent. *Just going along with it out of fear is not consent*." (Emphasis added.)

Later, the prosecutor discussed the individual elements of the offense of rape:

"So then we've got Count 5. This is the rape. So the defendant knowingly engaged in sexual intercourse with [Susan]. Well, what did he tell the detectives. He said they had makeup sex. There's no reasonable doubt, that element is there.

"[Susan] did not consent to sexual intercourse. She told Officer Kanhasee she did not consent. Her answer in the hospital room, and you've got the Axon, you can watch it, she says, well, no. She went along with it, but she thought it was the safest thing to do.

"And that brings us to the next element. The sexual intercourse occurred under circumstances when [Susan] was overcome by fear. What does the opposite of what was the safest thing to do sound like to you. To not go along with it, to say no is unsafe. [Susan] was overcome by fear as she indicated to Officer Kanhasee."

Following this discussion of the elements, the prosecutor went on to describe the violent details of the incident—the choking to the point of unconsciousness and urination, the beating, and threatening with a knife—that further supported both the finding that

16

Susan did not consent and that she was overcome by force or fear. Arguing that certain evidence could support a finding on both elements is not the same as arguing that the two elements are the same thing. The prosecutor was not conflating two elements into one but was explaining a source of evidence from which the jury could find that Susan was overcome by fear and did not consent to the sexual intercourse. A fair reading of the prosecutor's arguments shows he did not misstate the law on the elements of rape.

Shrubshall's argument that the prosecutor misstated the facts is similarly contradicted by the record. "It is well established that the fundamental rule in closing arguments is that a prosecutor must confine his or her comments to matters in evidence. When the prosecutor argues facts that are not in evidence, prosecutorial error occurs." *State v. Carr*, 314 Kan. 744, Syl. ¶ 20, 502 P.3d 511 (2022). Shrubshall argues the prosecutor erred by telling the jury that Susan indicated that she did not consent to the sexual intercourse when she was interviewed by an officer at the hospital. When Susan was asked by the officer if the encounter was consensual, she replied, "Well, no I didn't tell him it was okay, but I didn't tell him to stop either. . . . I just went along with it cause I thought it was the safest thing for me to do."

Kansas courts have long recognized that a prosecutor has the latitude during closing argument to highlight the evidence presented and to draw reasonable inferences from that evidence. See, e.g., *State v. Brown*, 316 Kan. 154, 164, 513 P.3d 1207 (2022). The fact that Susan's response is cited by both parties to support opposite conclusions—that Susan was either indicating that she did or did not consent to the sexual intercourse—shows that the prosecutor was not misstating the evidence but merely interpreting it and offering a reasonable inference to be drawn from it. Because the prosecutor did not argue facts outside the evidence or mischaracterize the evidence, it cannot be said that he committed prosecutorial error when he argued that Susan indicated to the officer that she did not consent to the sexual intercourse.

The record does not support Shrubshall's argument that the prosector misstated the law or the facts during closing arguments. Because Shrubshall has failed to show any prosecutorial error, we need not address prejudice. *Sherman*, 305 Kan. at 109.

*Shrubshall's constitutional challenges to his rape conviction are unpreserved and without merit.*

Shrubshall next claims the rape statute is facially unconstitutional because "[a] prosecution for a severity level one offense as a strict liability offense violates the substantive protections afforded by the Due Process Clause." That said, Shrubshall "recognizes that the Kansas Supreme Court has ruled to the contrary in *State v. Thomas*, 313 Kan. 660, 664, 488 P.3d 517 (2021), but includes this issue to preserve it for possible federal review." The State contends Shrubshall's argument is foreclosed by Kansas Supreme Court precedent holding that even if K.S.A. 21-5503(e) rendered the offense of rape a strict liability crime, it does not violate a defendant's due process rights.

Though Shrubshall raised an objection to the jury instruction on rape, he did not raise the constitutional challenge before the district court. See *Schutt v. Foster*, 320 Kan. 852, 855-56, 572 P.3d 770 (2025) ("Generally, appellate courts do not address issues raised for the first time on appeal."). In any event, this court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication the Supreme Court is departing from its previous position. *State v. Rodriguez*, 305 Kan. 1139, 1144, 390 P.3d 903 (2017). In *Thomas*, the Kansas Supreme Court rejected the very argument Shrubshall is making in this appeal, finding that even if rape lacked an intent requirement, "nothing in our law suggest[s] due process prohibits the Legislature from adopting strict liability criminal offenses." 313 Kan. at 663. Shrubshall is entitled to no relief on his claim that his rape conviction violates due process because it is a strict liability offense.

18

Finally, Shrubshall claims the rape statute is unconstitutionally vague because it "does not require any mens rea related to criminal conduct." As with his previous constitutional challenge, Shrubshall "recognizes that the Kansas Supreme Court recently rejected this same claim in *State v. Ninh*, 320 Kan. 477, 570 P.3d 1169 [(2025)], but includes this issue to preserve this issue for possible federal review." The State agrees that Shrubshall's vagueness challenge is foreclosed by Kansas Supreme Court precedent.

Shrubshall objected to the jury instruction for rape on related grounds, but he did not independently raise this constitutional challenge before the district court. In any event, as Shrubshall concedes, he is not entitled to relief even if this court reached the merits of his vagueness challenge. In *Ninh*, 320 Kan. at 490-92, the defendant challenged both the rape and aggravated criminal sodomy statutes as facially unconstitutional based on vagueness because the statutes do not give fair notice as to what conduct constitutes the crimes. The *Ninh* court rejected these arguments and concluded that a person of ordinary intelligence would understand what is meant by the words used in the rape statute and would have fair notice of the unlawful conduct to avoid committing these crimes. 320 Kan. at 490-92. This court is duty-bound to follow Kansas Supreme Court precedent unless there is some indication the Supreme Court is departing from its previous position. *Rodriguez*, 305 Kan. at 1144. Shrubshall is entitled to no relief on his claim that the rape statute is unconstitutionally vague.

Affirmed.